JAMES W. LUSK et al., Receivers of Railroad and Properties of St. Louis & San Francisco Railroad Company, Appellants, v. JOHN M. ATKINSON et al., Constituting Public Service Commission of Missouri.

**In Banc, May 15, 1916.**

1. **PUBLIC SERVICE COMMISSION:** Judicial Powers. The Public Service Commission is not a court, nor is it vested with the essential functions and powers of a court of law and equity; and if the Legislature, by the act creating it, had attempted to clothe it with such powers, the act would have been void, since the Constitution vests the judicial power in certain mentioned courts and the commission does not fall under the the head of any of the classes of courts so mentioned.

2. ————: Administrative Agency. The design of the Public Service Commission Act of 1913 was to create an administrative agency of the lawmaking power; the findings and orders which the commission is empowered to make, though bearing some resemblance to some of the judicial acts of courts of law and equity, are nevertheless merely incidents of the work of investigation and determination of facts and questions devolved upon it by the Legislature. It has no

power to expound authoritatively any principle of law or equity, and has no machinery for enforcing its orders.

.3. ———: ———: Findings. In reviewing findings of facts made by the Public Service Commission, the courts do not accord to them that probative effect which would normally be accorded to the findings and judgment of a court of law in the course of regular judicial proceedings. The power of court review provided by the act itself makes the hearing in the court turn solely on the question of the preponderance of the competent evidence adduced at the hearing before the commission, unaffected, as far as the reviewing court is concerned, by any conclusions of fact or law arrived at by the commission, except that, just as in an equity suit, deference may be extended to the commission's finding of facts in cases in which the commissioners are in a better position to properly measure the credibility of the witnesses.

4. INTERSTATE SHIPMENT: Accumulation Point: Ultimate Destination. Non-resident tie-contractors had contracts to furnish ties to two Eastern railroads. For some years they had received the ties from makers at six or eight towns on the Frisco Railroad in three or four counties in Southeast Missouri, and shipped them in carload lots directly, usually by way of Cairo, Illinois, to these Eastern railroads. When the State rates were lowered, they leased a vacant lot at Commerce, established a tie-yard on it, had the ties shipped by the Frisco from these towns to that tie-yard, there unloaded, inspected and culled, and those that were of the standard fixed by the contract were loaded on barges, taken to Cairo and from there, after being inspected, sent on to their Eastern destination, and those which did not meet that standard, which were a negligible quantity, were left in the tie-yard at Commerce, and none of them had been sold at the time the contractors asked the Public Service Commission to make an order requiring the Frisco Railroad to charge only the state statutory rates from these towns to Commerce. No work or manufacture of any kind was performed on the ties at Commerce. Held, that as the tie-contractors knew and intended even before they purchased the ties from the makers that their ultimate destination was in another State, the essential character of the shipment of so much of the ties as were intended to be shipped out of the State, from the time they were actually started at these towns until they reached their ultimate destination, was interstate, and the Frisco Railroad is entitled to collect the tariffs fixed by the Interstate Commerce Commission for carrying them; but the shipment from these towns to Commerce of so much of the ties as were not embraced in the contracts and were not intended for outside shipment, but were intended to be sold delivered in the State,

or were after their arrival at Commerce shipped to some other point within this State and there sold or used, was intrastate commerce, and as to them the State Commission has power to fix the carriage charges.

*Held*, by WOODSON, C. J., with whom GRAVES and WALKER, JJ., concur, that, since the evidence shows the supply of of ties at the various towns was growing short and a carload could not be had at any one of them without bringing some from one or more of the other towns, which was expensive, and that the tie-yard at Commerce was established as an accumulation yard, at which the ties could be inspected, sorted and culled, the shipment did not take on an interstate character until they were loaded at Commerce and started on their final continuous journey to their ultimate destination in another State, and the ties did not enter into interstate commerce until they were loaded on the barges at this accumulation yard, and, hence, that the shipment of all the ties from these towns to Commerce was intrastate.

5. ———: **Power of Congress Exclusive.** The power of Congress over interstate commerce is exclusive as to those subjects demanding singleness of regulation; and while the State may regulate it as to other matters susceptible of dual regulation until Congress exercises its power, yet when Congress does act a state regulation is superseded.

6. ———: **Intention: In Pursuance to Prior Contract.** Where the intention of the shipper at the starting point is that the commodity shall be a part of interstate commerce, and that intention is coupled with a prior contract for its sale to a buyer in another State, the shipment is interstate commerce.

7. ———: **In Part By Private Carrier.** Where the evidence establishes that the nature of the shipment from its initial point is interstate commerce, the State has no power to prescribe railroad rates for such distance as it was carried in this State, on the ground that after the initial railroad had unloaded the goods at the State's boundary, they were carried across the interstate line by a private carrier (a barge line which was not a public interstate carrier) and there delivered to another railroad. The failure of the Federal law to invest jurisdiction in the Interstate Commerce Commission to fix rates covering the whole distance the goods are carried when all the connecting carriers are not "under a common control, management or a continuous carriage of shipment" does not change a shipment which in its essential nature is interstate into an intrastate one, nor give the State Commission power to fix the charges of so much of the interstate carriage as is done by a railroad in this State.

Appeal from St. Louis City Circuit Court.— *Hon.* *Rhodes E. Cave,* Judge.

REVERSED AND REMANDED (*with directions*).

*W. F. Evans* and *Thomas Bond* for appellants.

(1) Shipments of lumber on local bills of lading from one point in a State to another point in the same State, destined from the beginning for ultimate delivery in another State, are interstate commerce. Railroad v. Tram Co., 227 U. S. 111; Terminal Co. v. Interstate Commerce Comm., 219 U. S. 498; Railroad Comm. v. Worthington, 225 U. S. 101. (2) Merchandise destined for delivery in another State acquires the character of interstate commerce as soon as actually started for its destination by delivery to the initial carrier. It is the nature of the traffic, and not its incidents, which determines whether it is intrastate or interstate. Railroad v. Tram Co., 227 U. S. 111; Terminal Co. v. Interstate Commerce Comm., 219 U. S. 498; Railroad Comm. v. Worthington, 225 U. S. 101.

*Edwin J. Bean* and *William G. Busby* for respondents.

(1) The maximum rate chargeable by the carrier upon a shipment of railroad ties between points wholly within this State is fixed by Sec. 3241, R. S. 1909. (2) The Public Service Commission had the power and authority to order that the receivers charge the legal rate fixed by section 3241 upon shipments to be made of railroad ties from the points in question in this State to Commerce, Missouri. Sec. 46, p. 582, Laws 1913. (3) The Public Service Commission is an administrative body, and this court, in reviewing its order, will not usurp administrative functions by setting aside a lawful order because the court may consider that this administrative power has not been wisely exercised.

Power to make the order and not the expediency of it is the question. Railroad v. Campbell, 230 U. S. 552; Interstate Commerce Comm. v. Ill. Cen. Ry., 215 U. S. 470; Interstate Commerce Comm. v. Railroad, 220 U. S. 251. The provision of section 111 of Public Service Commission Act, Laws 1913, p. 642, that suits brought to review orders and decisions of the commission shall be determined by the circuit court as suits in equity only, refers to the manner of trial; that is, without a jury. (4) The carriage by said receivers of the ties of B. Johnson & Son from Bloomfield and other points named in the complaint to Commerce was wholly intrastate and was not a movement in interstate commerce; hence the Public Service Commission had jurisdiction to order a compliance with the statute of this State naming a maximum charge for such intrastate carriage. Railroad v. Iowa, 233 U. S. 334; State v. Railroad, 152 Iowa, 317; Milling Co. v. Railroad, 28 I. C. C. 699; Coe v. Errol, 116 U. S. 517; Bacon v. Illinois, 227 U. S. 504; Coal Co. v. South Amboy, 228 U. S. 665.

*Ralph E. Bailey* for B. Johnson & Son, original complainants.

(1) The Interstate Commerce Act does not apply to the carriage or handling of property, by rail or otherwise, when such carriage or handling is performed wholly within the State. Interstate Commerce Comm. v. Belaire Railroad Co., 77 Fed. 942; Ex parte Koehler, 30 Fed. 867; Fruit Exchange v. Railroad, 2 I. C. C. 142; Gallogy & Firestone v. Railroad, 11 I. C. C. 1; Act of Congress to Regulate Commerce, sec. 1. (2) In the absence of fraud or intention of avoiding freight charges, and in the absence of prearranged continuous transportation and continuous possession and control of the property shipped, by the connecting carriers, the mere knowledge or intent that the property shipped, or a portion thereof, will ultimately reach a foreign destina-

tion is not sufficient within itself to constitute interstate commerce, or to change the character of a local shipment into an interstate shipment. Cook on the Commercial Clause of the Federal Constitution, sec. 26, p. 52; Railroad v. Taylor, 103 Tex. 367; Tie & Lbr. Co. v. Railroad, 1 I. C. C. 30, 1 I. C. C. 607; Railroad v. State, 97 Tex. 274, 204 U. S. 403; Coe v. Erroll, 116 U. S. 517; Match Co. v. Ontonagon, 188 U. S. 82; Interstate Commerce Comm. v. Railroad, 77 Fed. 942; Railroad v. Whitehead, 6 Tex. App. 595; U. S. v. Railroad, 81 Fed. 783; Railroad v. Interstate Com. Comm., 162 U. S. 184; Railroad v. Osborn, 52 Fed. 912; Interstate Com. Comm. v. Railroad, 167 U. S. 633; Railroad v. Miami S. S. Co., 86 Fed. 407; Bacon v. Illinois, 227 U. S. 504; Coal Co. v. South Amboy, 228 U. S. 665.

### STATEMENT.

Appellants, the receivers of the Frisco Railroad Company, sued out a writ of *certiorari*, or review, in the circuit court of the city of St. Louis, on the 5th day of February, 1914, to quash the proceeding of the Public Service Commission of the State of Missouri *in re* a complaint filed with it, on the tenth of September, 1913, on behalf of B. Johnson & Son, wholesale dealers in railroad ties, doing business in Richmond, Indiana, against the receivers of the St. Louis & San Francisco Railroad Company, wherein it was charged that said carrier exacted a higher rate for the shipment of ties from points in southeast Missouri to a station known as Commerce on its line, than was permissible under section 3241 of the Revised Statutes of Missouri.

The defense interposed to this complaint was that the transportation of said ties was a part of the movement of interstate commerce, and hence the rate charged was in conformity to the regulation thereof by the Federal Interstate Commerce Commission. After hearing the evidence, the Public Service Commission of Missouri entered an order, based on the findings and opinion of Commissioner William F. Woerner,

on the fifth day of January, 1914, to the effect that the defendants in the complaint made to the Public Service Commission of Missouri should charge the complainants therein upon *all* shipments of railroad ties from the towns mentioned in the complaint in southeast Missouri, when billed to the town of Commerce, Missouri, at the rate fixed by section 3241 of the Revised Statutes of Missouri, prescribing the rate of freight charged for intrastate traffic, and directed its secretary to furnish the defendant receivers of the Frisco road with the certified copy of said order, and the opinion whereon it was based.

Upon a motion for a rehearing, made by the defendants in said complaint, the opinion of Commissioner Woerner was modified and refiled and the motion for rehearing overruled. All the proceedings and evidence had and taken before the Public Service Commission were certified to the circuit court in obedience to the present writ.

Upon a trial had there on the twenty-seventh day of February, 1914, and after consideration of the record so certified to it, the circuit court of the city of St. Louis, took the cause under advisement until its April term and then affirmed the order entered by the Public Service Commission. The plaintiffs in the *certiorari* filed a motion for a new trial on the ground that the order made by the circuit court was in violation of the Public Service Commission Act (Laws of 1913, p. 557 et seq.), and was in contravention of section 8, article 1, of the Constitution of the United States, empowering Congress "to regulate commerce with foreign nations, and among the several States, and with the Indian tribes," and the 14th Amendment to the Constitution of the United States, and also of the Constitution of the State of Missouri.

Upon the overruling of their motion for a new trial, plaintiffs in the petition for *certiorari,* or review, duly appealed to this court.

OPINION.

BOND, J. (After stating the facts as above).—

I.   It is insisted in support of the orders of the Public Service Commission: First, that the only judicial review to which they are open is jurisdiction of the board or its "power to make the order," and that nothing beyond this is presented by the writ of *certiorari* or review under the terms of the statute (Laws 1913, p. 641, sec. 111); second, that the transportation in question was wholly one of intrastate dealing.

Powers and Findings of Public Service Commission.

Taking these contentions in order: we are not impressed with the soundness of the first.   The Public Service Commission was created *eo nomine* by the Legislature of 1913.   [Laws 1913, p. 556, secs. 1 to 40 inclusive.]   The design of the act was to create an administrative agency of the lawmaking power.   The board of commissioners thus established were not intended to be vested with the essential functions and powers of a court of law and equity, for under the express provisions of the Constitution of Missouri, the Legislature could establish courts only in the classes of cases, and in the manner and to the extent provided by that instrument, and the board does not fall under the head of any of the courts described in the Constitution.   [Constitution of Missouri, art. 6, secs. 1, 28, 31; State ex rel. v. Nast, 209 Mo. 708; State ex rel. v. Fort, 210 Mo. 512; State ex rel. Haughey v. Ryan, 182 Mo. l. c. 355; State ex rel. v. Woodson, 161 Mo. l. c. 453.]

Since the Legislature has no power to create a court not falling within the classes specified in the Constitution, nor in any other manner than therein empowered so to do, it follows that the Public Service Commission is only a representative agency established by the Legislature, whose powers and duties are specifically set forth, none of which include the prerogatives of a court; for neither the Legislature nor any

of its delegated agencies could exercise these under our Constitution, and if the act had been passed for that purpose, it would be void. The findings and orders, which the Public Service Commission is empowered to make, though bearing some resemblance to some of the judicial actions of a court of law and equity, are yet merely incidents of the work of investigation and determination of facts and questions devolved upon that body by the Legislature, and do not imply on its part the possession of any of the essential attributes or machinery of constitutional courts in this State. The Public Service Commission has no power to expound authoritatively any principle of law or equity and has no machinery for enforcing its orders. In reviewing a finding of facts made by the Public Service Commission, we do not accord to them that probative effect which would normally belong to the findings and judgment of a court of law in the course of regular judicial proceedings. In providing for a review, by the present writ, of the findings and orders of the Public Service Commission, the Legislature carefully bore in mind this distinction, and hence by section 111 of the constituting act, it provided for a transfer of the final orders and findings of its administrative agency (Public Service Commission) by writ of review, to the circuit court, for the purpose of testing ''the reasonableness or lawfulness'' of its actions, and directed the Public Service Commission to certify and transmit all the *evidence and exhibits*'' introduced before it, to the circuit court, and required that court, in rendering its judgment, to consider without the aid of a jury, only the *specific evidence* and proceedings upon which the action of the Public Service Commission was based.

The paragraph indicating the scope and method of review thus lodged in the circuit court concludes in the following terms:

''The circuit courts of the State shall always be deemed open for the trial of suits brought to review

the orders and decisions of the commission, as provided in this act, and the same shall be tried and determined as suits in equity.''

This latter quotation from the statute is absolutely decisive of the first contention made in support of the action of the Public Service Commission, for it states in express terms that the hearing in the circuit court "shall be *tried* and *determined* as suits in equity.'' It is perfectly obvious that the power of court review thus provided for in the Act of the Legislature, makes the hearing in the circuit court, as well as the determination of the correctness of its action on an appeal to this court, turn solely on the question of the preponderance of the competent evidence adduced on the original hearing before the Public Service Commission, unaffected, as far as the reviewing courts are concerned, by any conclusions of fact or law arrived at by the Public Service Commission when the matter was undergoing investigation before it.

It is unnecessary to cite precedents as to the nature of trials of suits in equity; for it is an inwrought principle of equity jurisprudence, antedating and surviving our Constitution, that the chancellor must conform his findings of fact to the preponderance of the competent evidence; and the same rule governs appeals in such actions which are triable *de novo* in the appellate courts on the evidence contained in the record. Since the statute in so many words makes this rule govern the trial of the proceedings before the Public Service Commission, when brought under review by the courts, it follows that the evidence contained in the present record is fully reviewable by us, and the correctness of the findings of the Public Service Commission and its affirmance by the circuit court, must be tested by the preponderance of proof afforded by the evidence contained in the record. The contention on the part of respondent that the right of review of this court is confined to the question of jurisdiction of the Public

Service Commission is in the teeth of the terms of the statute and therefore disapproved by us.

The cases cited from the Federal judiciary are neither in point nor persuasive, for an examination of the acts to which they applied shows that such acts contained no such provisions for broad court review, as are contained in the act creating the Public Service Commission.

II.   Considering, as we must, the probative force of the testimony given before the Public Service Commission, as it should be judged if given in a suit in equity, we find the preponderance of the evidence sustains the following facts.   Indeed, they are practically undisputed.   That B. Johnson & Son were wholesale dealers in railroad ties, residing and doing business at Richmond, Indiana; that for five or six years prior to July 15, 1913, said firm employed an agent in Southeast Missouri to purchase for them railroad ties and to ship them in fulfillment of contracts of sale made with certain railroads, particularly the New York Central and the Rock Island; that the custom was to collect the ties purchased by a tie buyer employed by Johnson & Son, at stations on defendant's railroad (The Frisco) from whence they would be shipped direct to their place of destination whether within or without this State; that this method of conducting their business was adhered to by complainants prior to the fifteenth of July, 1913; that after that date the tie buyer employed by complainants arranged for permission to them to use a vacant lot of ground lying between the Frisco railroad tracks and the Mississippi River, at Commerce, Missouri, whereon ties bought by him for complainants could be unloaded and inspected and then forwarded by barge or railroad to the purchasers from complainants; that all the ties which had been transported to this Commerce yard, or landing, have been carried by barges to

*Facts Established by Evidence.*

Cairo, Illinois, and other points outside the State of Missouri, except a single car which had been sent to St. Louis *after* the filing of the complaint before the Public Service Commission, and twenty-five hundred ties which remained on the yard or landing at the time the testimony was given.

The ties so transported for complainants to Commerce were carried under a bill of lading, noting complainants as the consignees, and the freight rate for this carriage was fixed by defendants in accordance with the schedule of rates prescribed by the Federal Interstate Commerce Commission, which was in excess of the rates fixed by statute in this State for intrastate shipments. This was the sole ground of complaint made by B. Johnson & Son before the Public Service Commission.

The evidence of the tie buyer, Tiller, on the point of his knowledge of the destination of the ties which he purchased for complainants, and the purchasers to whom they would be shipped is, to-wit:

"Q. Now, when they sent you out to buy these ties, did they tell you what railroads they were going to? A. Well, this time, since I have been working for B. Johnson, I understood we had contracts with the Rock Island and New York Central lines, and these ties were to be applied on those two contracts.

"Q. To whom have these ties that have been shipped from Commerce by barge; to whom have they been sent? A. Some of them have been shipped to Wheeling and Lake Erie, some branch of the New York Central System.

"Q. Delivered to them at Cairo? A. All except about four carloads we sold in Cairo after we got there.

"Q. That is because they were rejected by the Wheeling and Lake Erie? A. Yes, sir; No. 2 ties we call them.

"Q. But they were shipped to Cairo for the Wheeling and Lake Erie? A. Yes,

"Voice: Make that Lake Erie and Western.

"Q. All right? A. I don't know.

"Q. That represents all the ties that have been shipped out of *Commerce* except one car? A. Yes, sir. . . . A. What I mean is this: The ties that were shipped to Cairo were sold to the New York Central System; just what particular branch of that system they went to I don't know about that."

Complainants claim that the aforesaid change in the method of shipment after the 15th of July, 1913, was made on their behalf at the instance of their tie buyer, who thought the locality selected would be a convenient depot for assembling ties purchased for them in Southeast Missouri, and thereafter inspecting and assorting them according to the provisions of their respective contracts with the purchasing railroads and then continuing the transportation of the ties from that point to their ultimate destination, so that each purchaser would receive the kind of ties described in his contract of purchase, and that the location of this yard was convenient in that ties of all description and applicable to any contracts might be taken to that point in carload lots; whereas if they were to be assorted at the initial point of delivery to the carrier, a delay might ensue before enough ties of the kind called for in a particular contract could be accumulated to make a carload.

Complainants had no office of any kind, nor any selling representative at Commerce, Missouri, nor was there any evidence whatever that any of its contracts of sale to the purchasing railroad were made at that point. On the contrary, the evidence is clear that the contracts of sale to which the ties shipped to Commerce were applied when they were transported to Cairo and other points, had all been made and entered into prior to the purchase of the ties, and a full description had been given to the tie buyer of the kind of timber and dimensions and size of the ties to be purchased by him to meet these contracts. No work of manufacture or

preparation of the ties was performed when they were landed at Commerce; they were simply assorted, inspected and sent on to meet the contract calling for them.

III. The only question which can arise under these facts is as to the nature of the shipment of the twenty-five hundred ties yet undelivered, and the one carload which was forwarded to St. Louis *after* the filing of the complaint. All of the remainder of the ties were shipped outside the State to the particular purchaser, who had contracted for them before they were acquired by plaintiff, and before they were delivered to the complainant railroad for transportation to Commerce, Missouri. With these exceptions complainants have complied with their contracts to ship to the purchasers outside the State and sent such shipments to them, subject to the inspection of the purchaser's agents at Cairo, Illinois. The amount of ties thus exported by complainant constitutes the bulk of the large accumulation of ties carried to Commerce. Leaving out of view the single carload sent to St. Louis *after* bringing the complaint (for the reason that the rights of the parties depended upon the status of their dealings which existed when the complaint was filed and not upon subsequent conditions), and we have this state of affairs; the entire body of ties taken to Commerce, except twenty-five hundred not yet forwarded, have been sent by barges to Cairo, Thebes or East St. Louis, in fulfillment by complainants of contracts of sale of such ties made with railroads outside of the State before any of the ties were delivered to defendant railroad for carriage to Commerce.

In the face of these facts, the Public Service Commission ordered the defendants to treat *all* future shipments of ties by complainants to Commerce, made under similar circumstances, as part of the dealings of complainants wholly within this State, and therefore to be

charged for at local statutory rates. If this conclu-
sion is correct, then a non-resident wholesale dealer in
railroad ties, who has contracted to sell and transport
to a purchaser outside this State ties to be obtained in
this State to fill such contracts, may start them on their
journey in this State and make a break at a point on the
boundary for preliminary assortment and inspection,
and thereafter continue the journey of the ties across
the border and deliver them to the agent of the pur-
chaser for final inspection in another State, without
paying for that portion of the railroad transportation
procured in this State the rate fixed by the Interstate
Commerce Act for shipments coming under its regula-
tions. It must be confessed if this can be done it
would open a wide avenue for evasion of the Federal
law, both by the shipper and by the carrier. In other
words, if a tie seller having a contract with a non-resi-
dent to take all ties of a certain kind and dimension,
should go into the interior of this State and purchase
ties suitable for filling such contracts, and instead of
shipping them direct from the nearest railroad station,
should add to them an insignificant amount of other
ties, and as thus intermixed, should ship the whole
bulk to the border of the State, and then segregate the
negligible addition, and promptly forward the others
outside the State and should only be charged a lower
local rate on the *whole* bulk of ties while in transporta-
tion in this State, a two-fold wrong would be done.
The shipper would thus obtain the carriage of the bulk
of his commodity, falling strictly within the definition
of interstate dealing, for a portion of its journey at a
less charge than fixed by the Federal Law, and the car-
rier accepting such lower rate would act unfairly to
other shippers engaged in interstate shipments without
a break in the transportation, by accepting in the sup-
posed case a lower rate of charge than demanded of
others.

The question, therefore, to be decided is whether or not the facts, as we have heretofore found them to be, entitled the defendat carrier to charge for the ties transported to Commerce, Missouri, the interstate rate for that portion of such ties which were afterwards forwarded by the shipper in fulfillment of his previous contracts with the foreign buyers? This question must be determined by the law as expounded by the Supreme Court of the United States, to which we will now recur.

A leading case is So. Pac. Term. Co. v. Interstate Commerce Comm., 219 U. S. 498. The controversy was whether the Federal board had jurisdiction to regulate the charges of a terminal company at Galveston, Texas, which had leased a wharf to one shipper upon terms that enabled him to get an advantage over other shippers who were required to pay certain charges for wharfing privileges. The Interstate Commerce Commission ordered the wharf owner to cease giving such preference. The use to which the wharf was put was to receive cotton-seed cake purchased by the lessees, which was ground into meal on the wharf and then put in sacks and exported to fill certain present and future contracts. The bill to enjoin the order of the commission was dismissed, and an appeal taken to the Supreme Court of the United States, where it was held: First, that the Terminal system owning the wharf was a link in transportation and thus became subject to the jurisdiction of the Interstate Commerce Commission; second, that the fact that the favored shipper caused these products to be *billed to his own order* from interior points in the State of Texas to the city of Galveston in the same State, and after receiving them there, unloaded them and changed their form from cotton-seed cake by grinding it into cotton-seed meal, and then sacked the meal and shipped the sacks to fill foreign orders did not make the transportation to Galveston from the initial point in Texas, intrastate commerce; but that such shipments became interstate commerce when they

were delivered in the form of cotton-seed cake to the initial carrier in the interior of the State.

Again, in Ohio Railroad Comm. v. Worthington, 225 U. S. 1. c. 107, the suit was to enjoin the State commission of Ohio from fixing rates for the shipment of coal from interior points in that State to its lake ports under billings to the shippers' orders. The court in its findings of facts, recited, to-wit:

" 'There is testimony to the effect that' when the coal leaves the mines it is not known in what vessel it will be loaded nor to what particular ultimate destination it will go, and that sometimes such coal is sold and vessels arranged for after the coal is at Huron, but it is subject to demurrage charge if it remains on the cars beyond a specified time.

" 'All coal thus loaded in vessels is, and must practically be, carried to points in other States—or to Canada. The lake ports in Ohio receive coal by rail from interior points, but not by boat from other Ohio ports. It might be that a quantity of coal, so small as to be negligible, is unloaded on one of the Ohio islands in Lake Erie, but no substantial importance is claimed for this circumstance nor could be given to it.'

"This finding of fact was practically approved and adopted in the Circuit Court of Appeals, and we have no occasion to dissent from its correctness.

"The question thus presented is: Was the Railroad Commission of Ohio authorized to put in force the rate in question as to lake cargo coal? It is not necessary to review the cases in this court which have settled beyond peradventure that the National Government has exclusive authority to regulate interstate commerce under the Constitution of the United States; nor to do more than reaffirm the equally well settled proposition that over interstate commerce transportation rates the State has no jurisdiction and that an attempt to regulate such rates by the State or under its author-

ity is void. [Louisville & Nashville Railroad Company v. Eubank, 184 U. S. 27.]

"And an order by a state commission under assumed authority of the State, which directly burdens or regulates interstate commerce, will be enjoined. [McNeill v. Southern Railway Company, 202 U. S. 543.]

"The question is, then, one of fact. Does the transportation which the rate prescribed by the Railroad Commission of Ohio covers, constitute interstate commerce? . . .

"It is contended that this transportation of the coal under the rate fixed by the Railroad Commission is not within the power and authority of the Interstate Commerce Commission under section 1 of the Act to Regulate Commerce, which makes the provisions of the act inapplicable to the transportation of property wholly within one state, and not shipped to or from a foreign country from or to a state or territory; and, furthermore, that a transportation of the character here in question is only within the jurisdiction of the Interstate Commerce Commission when it is a transportation partly by railroad and partly by water when both are used under a common control, management or arrangement for a continuous carriage or shipment; and therefore that the subject-matter in question is left within the state jurisdiction. On the other hand, it is contended that this transportation is within the jurisdiction of the commission under the Act to Regulate Commerce. *It is enough to now hold, as we do, that the establishing of the rate in question is an attempt to regulate interstate commerce and is therefore beyond the power of the state or a commission assuming to act under its authority.*

"We therefore reach the conclusion that under the facts shown in this case the Railroad Commission, in fixing the rate of seventy cents for the transportation above described, attempted to directly regulate and control interstate commerce, and, for that reason, the

enforcement of its order should be enjoined.'' (Italics ours.)

Next comes the case of Texas & N. O. Railroad v. Sabine Tram Co., 227 U. S. 1. c. 119, where the only question was whether the shipment of lumber from Ruliff to Sabine (both points of Texas) to shipper's order, but subsequently exported, was interstate commerce, and hence not subject to a state rate. The modified finding of facts contained the following:

'' 'Powell & Company purchased lumber from other mills in Texas, with which to supply its said sales in part; *it did not know when any particular car or stick of it left Ruliff,* into which ship or to what particular destination it would ultimately go, *or on which sale it would be applied;* this not being found out until its agent, Flannagan, inspected the invoice mailed to and received by him after shipment. Upon inspection of the invoice he determined from the character of the lumber described whether it was suited for one cargo or the other.' '' (Italics ours).

The court said upon these facts, to-wit (l. c. 126):

''The determining circumstance is that the shipment of the lumber to Sabine was but a step in its transportation to its real and ultimate destination in foreign countries. In other words, the essential character of the commerce, not its mere accidents, should determine. It was to supply the demand of foreign countries that the lumber was purchased, manufactured and shipped, and to give it a various character by the steps in its transportation would be extremely artificial. Once admit the principle and means will be afforded of evading the national control of foreign commerce from points in the interior of a state. There must be transshipment at the seaboard, and if that may be made the point of ultimate destination by the device of separate bills of lading, the commerce will be given local character, though it be essentially foreign.''

A judgment for the difference between the State rates and that fixed by the Interstate Commerce Commission was reversed, the court saying (l. c. 130):

"Nor, as we have seen, did the absence of a definite foreign destination alter the character of the shipments. Judgment reversed and case remanded for further proceedings not inconsistent with this opinion."

In the case of Louisiana R. R. Comm. v. Tex. & Pac. Ry. Co., 229 U. S. 1. c. 341, the foregoing cases are quoted and approved, and it is said:

"In those cases there was necessarily a local movement of freight, and' it necessarily terminated at the seaboard. But it was decided that its character and continuity as a movement in foreign commerce did not terminate, nor was it affected by being transported on local bills of lading. The principle enunciated in the cases was *that it is the essential character of the commerce,* not the accident of local or through bills of lading, which determines Federal or State control over it. And it takes character as interstate or foreign commerce *when it* is actually started in the course of transportation to another state or to a foreign country. The facts of the case at bar bring it within the ruling." (Italics ours).

Also, in the case of Chi., M. & St. P. Ry. v. Iowa, 233 U. S. 1. c. 343, the question arose upon a shipment into Davenport, Iowa, of coal purchased in Illinois. The consignee was a coal dealer, and Davenport, Iowa, was his selling and distributing point. *None of this coal was sold prior to its arrival.* On that point the finding of the commission and the State Supreme Court was adopted by the Supreme Court of the United States, and was to-wit:

" 'The coal was under the control of the consignee and he could sell it in transit or at Davenport or reconsign it to a point on respondent's railway, or any other railway, at his own discretion.' "

The court (Supreme Court of Iowa) said:

"That the facts showed that the coal was originally consigned to the coal company in Davenport, that it was *there held until sales were made,* and that the consignee had taken delivery, paying the freight to the initial carrier and assuming full control. [152 Iowa, 317, 319.] " (Italics ours).

Upon these facts all *future* sales and deliveries in Iowa were held to be intrastate dealing by the local commission and the State courts. As to which the Supreme Court of the United States said, to-wit:

"The record discloses no ground for assailing this finding. It is undoubtedly true. that the question whether commerce is interstate or intrastate must be determined by the essential character of the commerce and not by mere billing or forms of contract."

This ruling was a full recognition and affirmance of all the foregoing cases cited in support of the above statement of the rule, but the facts in the latter case demanded a converse application of the rule, for as shown above, the facts were that the consignee in Davenport, Iowa, had never sold nor contracted to sell any of the coal which he imported to that point from the coal fields of Illinois, but simply caused it to be brought to himself in Davenport for *future* sale. He paid the freight in full and took possession of the coal after it arrived in Davenport. This necessarily ended its interstate transit. He thereafter, as owner of the property, made sales of it to certain other localities in Iowa, and in fulfilling these latter sales, the transaction in the strictest sense of the term, was an intrastate one. Had these shipments been made to Davenport for the purpose of fulfilling *previous* sales of the coal by the consignee to buyers at other points in Iowa, the transaction in. question would have been an interstate commerce one from the beginning point in Illinois until the coal reached its ultimate destination in Iowa, and the break in the journey at Davenport would not, in any respect,

have affected its character as interstate commerce. This is demonstrated by the above ruling which affirmed and cited all the previous rulings of the Supreme Court of the United States to *that effect*.

As to the complete immunity of interstate commerce from even the indirect effect of competitive state rates, an advanced ruling is expressed by the opinion of the Supreme Court of the United States (Mr. Justice HUGHES) in Houston, E. & W. Tex. Ry. v. United States and Tex. & Pac. Ry. v. U. S., 234 U. S. 342, l. c. 353. It is there held that the paramount power of Congress to control interstate commerce extends through its agency (the Interstate Commerce Commission) to the control of *intrastate* transactions of interstate carriers, where that is necessary to protect interstate commerce. Said the court:

"We find no reason to doubt that Congress is entitled to keep the highways of interstate communication open to interstate traffic upon fair and equal terms. That an unjust discrimination in the rates of a common carrier, by which one person or locality is unduly favored as against another under substantially similar conditions of traffic, constitutes an evil, is undeniable; and where this evil consists in the action of an interstate carrier in unreasonably discriminating against interstate traffic over its line, the authority of Congress to prevent it is equally clear. It is immaterial, so far as the protecting power of Congress is concerned, that the discrimination arises from intrastate rates as compared with interstate rates. The use of the instrument of interstate commerce in a discriminatory manner so as to inflict injury upon that commerce, or some part thereof, furnishes abundant ground for Federal intervention. Nor can the attempted exercise of state authority alter the matter, where Congress has acted, for a state may not authorize the carrier to do that which Congress is entitled to forbid and has forbidden."

The point for decision in that case arose out of the fact that there was a sharp competition between the city of Shreveport, Louisiana, and certain cities in the interior of Texas, for the business of certain towns lying *between* the two competing points. The Interstate Commerce Commission has fixed the rates from Shreveport, Louisiana, to the competitive points. The Texas law had fixed an intrastate rate which permitted the carriage of similar products from other cities in Texas the same distance as Shreveport from the competitive points, at a lower rate than that fixed by the Federal board. Thereupon the latter (Interstate Commerce Commission) required the railroads using the lower state rate to equalize their charges, and to desist from discrimination resulting from using the local state rate. The Supreme Court affirmed the validity of that order in the following language:

"It is also clear that, in removing the injurious discriminations against interstate traffic arising from the relation of intrastate to interstate rates, Congress is not bound to reduce the latter below what it may deem to be a proper standard, fair to the carrier and to the public. Otherwise, it could prevent the injury to interstate commerce only by the sacrifice of its judgment as to interstate rates. Congress is entitled to maintain its own standard as to these rates, and to forbid any discriminatory action by interstate carriers which will obstruct the freedom of movement of interstate traffic over their lines in accordance with the terms it establishes.

"Having this power, Congress could provide for its execution through the aid of a subordinate body; and we conclude that the order of the commission now in question cannot be held invalid upon the ground that it exceeded the authority which Congress could lawfully confer."

It was accordingly ruled that the order of the commission requiring in substance the discriminating rail-

road to charge a higher rate for intrastate carriage than fixed by the local statute, thereby ceasing its discrimination against Shreveport, Louisiana, should be obeyed. To the same effect: Railroad v. United States, 205 Fed. 380 and 391; Intermountain Rate Cases, 234 U. S. 476. The decision of the Supreme Court in the Shreveport case, and its previous ruling in the Minnesota Rate Cases, 230 U. S. 1. c. 433, have been made the theme of a learned discussion of the evolution of the law under the commerce clause of the Constitution. The writer analyzes all the decisions from Gibbons v. Ogden, 9 Wheat. 1. c. 222, to the cases cited. [Harvard Law Review, Nov. 1914, page 34 et seq.] This article is accurate and instructive in its historical review, though critical in commenting on the decisions in Minnesota Rate Cases and the Shreveport case, supra. These decisions, however, are the final word on the subject of the power of Congress under the commerce clause of the Constitution and are but the corollaries of the rulings in the Minnesota Rate Cases, to-wit:

First. "The grant in the Constitution of its own force, that is, without action by Congress, established the essential immunity of interstate commercial intercourse from the direct control of the states with respect to those subjects embraced within the grant which are of such a nature as to demand that, if regulated at all, their regulation should be prescribed by a single authority. It has repeatedly been declared by this court that as to those subjects which require a general system or uniformity of regulation, the power of Congress is exclusive."

Second. "In other matters, admitting of diversity of treatment according to the special requirements of local conditions, the states may act within their respective jurisdictions until Congress sees fit to act; and, when Congress does act, the exercise of its authority overrides all conflicting state legislation."

Third. ''The principle which determines this classification, underlies the doctrine that the states cannot under any guise impose direct burdens upon interstate commerce. For this is but to hold that the states are not permitted directly to regulate or restrain that which from its nature should be under the control of the one authority and be free from restriction save as it is governed in the manner that the national legislature constitutionally ordains.'' [Minn. Rate Cases, 230 U. S. l. c. 400.]

Fourth. Subject to the above limitations, ''the completely internal commerce of a state then may be considered as reserved for the state itself.'' [Gibbons v. Ogden, 9 Wheat. l. c. 195.]

The foregoing rulings may be condensed, to-wit:

1. As to those subjects of interstate commerce which require a general system or uniformity of regulation, the power of Congress is exclusive whether exercised or not. This exclusive power results from the mere grant in the Constitution.

2. As to those subjects which do not fall in this class but owing to local conditions may be regulated by two authorities, the states may act until Congress does, but when Congress acts it obliterates all state legislation on the subject. In these cases the power of Congress becomes exclusive only when exerted.

3. The reason for this distinction is that interstate commerce proper, requiring for its protection singleness of regulation, if regulated at all, must be regulated by that authority (Congress) to which the Constitution has *granted* the power.

4. As to subjects purely local and whose regulation does not directly or indirectly affect interstate traffic, full power to deal with them is reserved to the several states.

Applying the foregoing decisions to the facts in this case, the sole question presented is: what was the ''essential character'' of the shipments of ties over de-

fendant's railroad? In order to determine this question it is important and necessary to ascertain:

1.  What was the motive or intention of the shipper?

2.  And what was the object and purpose to which the shipment was devoted? These two tests necessarily determine the nature of the shipment as being interstate or intrastate, and they were had in mind in each of the foregoing cases wherein the court passed upon that question.

In the Galveston case *the intention* of the shipper and the object of the shipment (export) were held sufficient to show that the carriage of cotton-seed cake from other localities in Texas to the wharf at Galveston, although transported under a bill of lading to the shipper's order, and although delayed at Galveston until it could be milled and ground into meal and sacked and forwarded to shipper's order, was from its initial point of delivery to the carrier a movement in interstate commerce. In one respect the shipments of the ties presents a stronger case, for in that matter the undisputed testimony shows that the great bulk of those consigned to the shipper's order from other localities in Missouri to the barge landing place at Commerce, were intended, after assortment, to be forwarded out of the State to fill *previous* contracts made for their purchase, and that fact did not exist in the Galveston case, for it was shown in that case that the buyer of cotton seed cake did not know to whom the manufactured product thereof (meal) would be sent after he had caused it to be brought to and delivered to himself at Galveston. It is evident as to the shipments from Commerce, Missouri, to points outside this State, the ruling in the Galveston case is clearly controlling. Equally decisive is the Worthington case, 225 U. S. 101, supra. That case related, as appears from the above statement of facts, to coal shipments from the interior of Ohio to its lake ports, whence the coal, or the bulk of it (for it appeared

in the facts in that case that a small quantity of the coal was unloaded finally on one of the Ohio islands in Lake Erie), was intended to be transshipped in lake boats to some distance outside the State of Ohio, but neither the boat nor the ultimate destination were known when the coal was delivered to the initial carrier in the interior of Ohio. However, it was held that the movement in interstate commerce began at the point of delivery to the first railroad carrier, and that the State of Ohio could fix no rates governing the charges from that point to the lake port. In the case at bar it was known when the ties were purchased and before they were delivered to the initial carrier, that the bulk of them, after assortment at Commerce, Missouri, to fill existing orders, would be thence transported by barge or interstate carrier outside the State. The case at bar is, therefore, stronger on the point of previous knowledge of ultimate destination—coupled with intention on the part of the shipper—than was the case of the coal shipped in Ohio. It will also be noted that the fact that a negligible quantity of the coal was disposed of finally on one of the Ohio islands, did not alter the interstate character of the great bulk of the commodity. In the case at bar the evidence shows that, except twenty-five hundred ties remaining at Commerce, and which, as far as the evidence in this case goes, may yet be shipped abroad, and, except one carload which complainants caused to be sent to St. Louis *after filing their complaint,* the entire purchase of ties made by plaintiffs in Southeast Missouri, has been transported to other states and delivered to the parties who purchased it before the shipment began. In dealing with the doctrine of these two cases and the Sabine case (227 U. S. 111), which were all that were brought to the attention of the Public Service Commission when this matter was heard by it (the later cases hereinbefore analyzed were not before that body), it used the following language:

"A close study of the doctrine announced in these cases leaves the complainants but a narrow margin upon which to stand in order to distinguish this case on solid grounds and thus escape an adverse ruling."

We gather from a further statement in the opinion of the Public Service Commission that it thought the present case could be differentiated from those called to its attention, because the ties were not "homogeneous," for on that subject their opinion uses this language:

"But in each of these three cases the cargo was homogeneous, so there was no difference in quality or kind. The same product shipped and unloaded at the intermediate point could be, and was, without anything further being done, simply re-loaded in the conveyance of the new carrier to be continued on its journey."

The only distinction between the ties was in the quality or kind of wood from which they were cut. They were all homogeneous in the sense that they were manufactured of wood of the same sizes and dimensions, and for the same uses. The inspection and assortment at Commerce was only for the purpose of adapting the ties to the respective requirements contained in the contracts as to wood out of which they should be made. *No work or manufacture of any kind was performed on any of these ties at Commerce, Missouri.* Nothing but a bare assortment after preliminary inspection.

The above quotation is in error in another respect, to-wit: "nothing being done to the product." In the Worthington case, the shipper had not sold the cottonseed cake, but intended to sell meal, a future product thereof, and he did no work on the original shipment, for *he ground it into meal.* We do not think that the distinction thus attempted by the Public Service Commission can be supported on any "solid ground." There is also a further statement in the opinion of the Public Service Commission, to-wit:

"And it can make no difference in law, under the conditions of this case, *that the shipper knew and intended at the very beginning that these ties would eventually go out of the State.* Knowledge and intention become factors only in connection with the actual final movement, and not in connection with a local movement, which is merely preliminary or anticipatory of a shipment beyond the limits of the State." (Italics ours).

This view is not in accord with the controlling decisions of the Supreme Court of the United States, for, as has been shown, a determinating factor in the mind of the court in the cases in which it has passed upon the nature of the shipment, arose upon the evidence disclosing that it was the *intention* of the shipper at the original point of delivery that the commodity in question should be a part of interstate commerce, and where such intention has been coupled with an existing contract for the sale of the goods to an outside buyer, it has been held to be *conclusive* of the fact that the shipment of the commodity from the beginning point was an interstate one and, therefore, not subject to the rates fixed by the local legislature or a local state board. Both of those conditions existed according to the undisputed evidence as to all the ties shipped to Commerce, with the exception heretofore noted.

It necessarily follows that the carrier in this instance was entitled to interstate rates on that portion of the ties which were carried by it to Commerce, and afterwards sent out of the State in fulfillment of the shipper's contract, for these were interstate shipments in the strictest sense of the term. And to the extent that the order of the Public Service Board prohibited the defendant carrier, without distinction, from charging interstate rates *on any* of the ties shipped to Commerce, it was clearly erroneous. The proper order which the board should have made in the matter of the complaint will be discussed in a later paragraph of this opinion.

IV.   But the opinion of the board sets forth another ground for the sustention of its general order, and this ground seems to be chiefly relied on by its learned counsel in his supplemental brief. This second ground is that by the terms of the Interstate Act, the jurisdiction of that board does not embrace interstate transportation when all its connecting carriers are not "under a common control, management or arrangement for a continuous carriage of the shipment." What was obviously meant by the act in the use of that language was that the Interstate Commerce Commission could not fix rates covering the whole distance the goods are carried, unless the connecting carriers were all of the class specified in the act and there was some arrangement between them for a continuous carriage or shipment. Whether, under that clause of the act the Interstate Commission could not validly prescribe the rates for the portion of transportation performed by the *public* carriers subject to its control, need not be decided. It is sufficient to say that whatever may be the interpretation of that part of the act, it cannot affect the *nature* of the shipment itself as being one of interstate commerce, provided it is made under conditions essential to give it that character. For if a shipment be shown to have the essential attributes of a movement in interstate commerce, then that fact will, of itself, render the rates covering intrastate commerce inapplicable and void as to it. The question is not one of jurisdiction of the Interstate Commerce Commission, or its *power* to fix rates for *private* carriers, but is one as to the nature of the shipment itself. When once that is established as being interstate, then the power of any state to prescribe rates for its transportation is precluded by the provision of the Constitution *granting* to Congress exclusive control over interstate commerce and all its instrumentalities. And this exact point as to the immunity of interstate commerce in any of its stages and

*Private Connecting Carrier.*

through any of its agencies from state control, is sustained in the clearest and most positive terms by the quotations hereinbefore made from the Supreme Court of the United States in the Shreveport rate cases, and other later cases cited in this opinion, which were not published when the Public Service Commission made its ruling in this matter. It is evident the order of the Public Service Commission of this State cannot be sustained on this theory, that the bargeman at Commerce who took the product across the river was not a public interstate carrier.

V. For the foregoing reasons, the omnibus order applying intrastate rates to *all* transportation of ties by the defendant carrier for the complainant between interior points in Missouri and the wharf landing secured by complainants at Commerce, Missouri, is erroneous, and if permitted to stand in its entirety, would necessarily work, under the facts in this record, an evasion of the rates fixed by the Interstate Commerce Commission, and a discrimination in favor of complainants against other shippers of similar products beyond the borders of the State.

*Order: Discrimination Between Interstate and Intrastate Shipments.*

Full and complete justice can be done to the parties to this controversy and the command of the Constitution obeyed, by a proper modification of the order made by the Public Service Commission, so that it shall read that the defendant carrier shall charge the complainants the intrastate rate fixed by the Legislature of Missouri as to any ties carried from interior points to Commerce, Missouri, which the complainants shall separate there from those sent out of the State in fulfillment of their contracts, and shall subsequently deliver to a bona-fide purchaser in this State at some locality in this State. Such a disposition of the matter will afford the complainants the full benefits of their place of landing for

their ties on the river bank at Commerce, Missouri, if established for a lawful purpose, and will make it the duty of the carrier to observe the law and treat all shippers alike. Besides it will furnish a conclusive test of complainants' good faith in conducting their shipments of railroad ties, for it will secure to them the state rates from the beginning point to final destination of all ties sent to Commerce in fulfillment of contracts to sell and deliver in this State, and require them to pay the interstate rate only on ties carried there in fulfillment of contracts to deliver outside of this State. If their new plan was adopted in good faith they will thus obtain the full benefit of it; if the event should show otherwise, then it ought not to prosper.

The judgment of the circuit court is reversed and the cause remanded with directions to that court to enter a judgment setting aside and quashing the order of the Public Service Commission, and to remand the complaint herein to that body for further disposition. *Faris* and *Revelle, JJ.,* concur; *Blair, J.,* concurs in separate opinion; *Walker, J.,* concurs in paragraph one and dissents as to result; *Woodson, C. J.,* dissents in separate opinion in which *Graves* and *Walker, JJ.,* concur.

BLAIR, J. (concurring) — The statute enjoins upon the circuit court and this court the duty to hear and determine cases of this kind ''as suits in equity.'' This implies the employment of all rules applicable on review in equity, including that concerning the deference due the finding when the trier of the facts, in the first instance, was for any legal reason in better position to weigh correctly the evidence. When it is construed to accord with this view I agree to paragraph one of the opinion. Further, the final sentence in the opinion exhausts our statutory power in remanding the cause, and what is said in paragraph five respecting the test to be applied in determining what ties fall within the inter-

state commerce classification, I understand to be a mere suggestion and not a direction to the Public Service Commission as to the orders it may hereafter make. The suggestion itself I except from my concurrence, not believing correct the test proposed. In other respects I concur in the opinion and the result reached.

WOODSON, C. J. (dissenting) — This complaint, was filed by B. Johnson & Son, before the Public Service Commission of the State of Missouri, against the receivers of the St. Louis and San Francisco Railroad Company, to determine the character of various shipments of railroad ties from various points in this State, over said railroad, to the town of Commerce, Missouri, as well as the rates the company were entitled to charge for making said shipments.

Counsel for the commission states the issues presented by the pleadings in the following language:

"Complaint was filed with the Public Service Commission by B. Johnson & Son against the receivers of the St. Louis and San Francisco Railroad Company, September 10, 1913, charging that during the month of August, 1913, complainants had shipped a large number of railroad ties over the said railroad from points in Southeast Missouri to Commerce, a station on said railroad in Scott County, Missouri; that said railroad company charged complainants on twenty-five carloads of ties shipped by said complainants the freight rates fixed by section 3241 of Revised Statutes of Missouri and thereafter refused to transport ties at the lawful freight rate fixed by section 3241, Revised Statutes 1909, but charged a higher rate on shipments of ties by complainants, claiming that said shipments were interstate shipments, that the interstate rate should be applied, notwithstanding said shipments to Commerce, Missouri, were wholly within this State, and that said receivers refused to carry railroad ties over their railway to Commerce, Missouri, at other

*Issues.*

than interstate rates; that said B. Johnson & Son had established and intended to maintain a tie yard at Commerce, Missouri, where all ties shipped by them to said point were unloaded, stacked and inspected, culled, divided, segregated and classified so as to be suitable for the different demands and markets to which B. Johnson & Son shipped ties and which were St. Louis, Missouri, Cairo, Illinois, and other points in Missouri and other States to which they shipped in the usual course of business; that B. Johnson & Son had a large number of ties at the following stations in the State of Missouri on the line of the St. Louis & San Francisco Railroad Company; Bloomfield, Campbell, Frisbee, Gibson, Mackey, Valley Ridge, Clarkton and Redman, to be shipped over said railroad by a route wholly within this State to the tie yard of B. Johnson & Son at Commerce, Missouri.

"Complainants prayed that said receivers be required to carry on said railroad the ties of B. Johnson & Son from the stations above named to Commerce, Missouri, at the rates prescribed and fixed by section 3241, Revised Statutes 1909, etc.

"The answer of the receivers thereafter filed with the Public Service Commission put in issue the allegations of the complaint."

Thereafter a hearing was held before the Commission, at which time evidence was introduced by both the complainants and the receivers of the railroad company. After due consideration of the cause, the commission made and entered of record an order on the 5th day of January, 1914, requiring the said receivers to carry the ties to be shipped by B. Johnson & Son from the points in Missouri to Commerce at the rates fixed by section 3241, Revised Statutes 1909. In due time the receivers filed a motion for a rehearing which was by the commission overruled by an order made on the 26th day of January, 1914. Thereafter on the 10th day of February, 1914, said receivers procured

to be issued from the circuit court of the city of St. Louis a writ of review, in response to which the Public Service Commission forwarded to said court a complete transcript of the record of its proceedings in said cause.

The case was heard before the circuit court, which made and entered an order affirming the order of the commission, from which the receivers have taken an appeal to this court.

The facts are practically undisputed, and are substantially as set forth in the statement of the case made by counsel for the appellants, which are as follows (Conclusions drawn from the facts by counsel are omitted):

For about four or five years prior to the filing of the complaint before the Public Service Commission of Missouri, the complainants in said complaint, B. Johnson & Son, were engaged in the business of purchasing and shipping railroad ties from various points in Southeast Missouri to points on the lines of the New York Central and Rock Island Railway systems, with which railway systems said complainants had contracts to supply railroad ties. They also sold some and delivered some of said ties to persons in the State of Missouri. The method in which these complainants transacted their business was to purchase ties in any quantities available at various points in Southeast Missouri, assemble them at the railroad station until they acquired a sufficient quantity to constitute a carload and then such of them as were of the character and grade called for in complainants' contract with the New York Central System were shipped on through bills of lading from points of origin to the point of destination on said system, and it appears from the testimony that the great bulk of the ties purchased by complainants were purchased for shipment to the New York Central, whose lines run wholly outside of the State

*Facts Established by Evidence.*

of Missouri. Complainants continued to transact their business in this manner until July 15, 1913, on which date the rates provided for in the Missouri Maximum Freight Rate Statute became effective. Immediately upon the State rates becoming effective, complainants made a change in the form of their business. Instead of accumulating a carload of ties at the point of origin, as it had been their practice in the past, they rented a piece of ground between the railroad tracks and the river at Commerce, Missouri, between Thebes and Cairo, which are the main junction points south of St. Louis between lines operating east of the river and lines operating west of the river. On this tract of land they established what they called a tie yard, and they commenced the practice of shipping their ties from the originating points in the interior of Missouri to their own order at Commerce, Missouri. Upon the arrival of the ties at Commerce they were unloaded, assorted into piles of similar grades and inspected. They then loaded most of the ties on a barge hired for that purpose and shipped them down to Cairo, where they were reshipped to the points of destination on the New York Central lines. The remainder was shipped to various other points within and without this State.

The evidence for the appellants tended to show that the number of ties shipped from Commerce to other points in the State of Missouri, and those remaining on hand at that place not suitable for shipment under the contracts of complainants with the New York Central and the Rock Island railroads, were negligible in number, not to exceed three thousand.

The complainants, among others, introduced Dr. J. A. Tiller, who testified as follows:

"Q. Where do you live, Dr. Tiller? A. Bloomfield, Missouri.

"Q. You have recently been an employee of B. Johnson & Son? A. I have.

"Q. Are you now in their employ? A. No.

"Q. Have you been familiar with the issues involved in this suit? A. I have; yes, sir.

"Q. Up to the present time? A. Up to the present time; yes, sir.

"Q. What were your duties with this company? A. Well, I was buying ties for them in Southeast Missouri; just a tie buyer.

"Q. First, what is the business of B. Johnson & Son? A. Well, they are manufacturers and wholesale dealers, you might say, in cross ties.

"Q. Where is their general office? A. Richmond, Indiana.

"Q. Are they a partnership or corporation? A. Partnership.

"Mr. Woerner: You might say who it consists of. A. B. Johnson and J. H. Johnson.

"Mr. Bailey: What did you say your duties were? A. To buy and ship railroad cross ties.

"Q. During the month of August, or about that time, did B. Johnson & Son ship a number of ties over the defendants' line to Commerce, Missouri? A. Yes, sir; they did.

"Q. What rate was charged upon those shipments? A. On the first shipments they charged the statutory rate of two cents per hundred pounds for fifty miles and under, with the advance; that rate is, I believe, a quarter of a cent per hundred pounds for every increase of ten miles in distance. I believe that is the rate.

"Q. Did they quit charging this rate? A. They did; yes, sir.

"Q. Did they charge you a higher rate? A. Yes, sir; they charged us a higher rate.

"Q. Have they since charged you a higher rate? A. Yes, sir; they have charged the higher rate for all ties shipped to that point since they quit charging the other rate.

268 Mo.—10

"Q. Did these shipments, doctor—you might state first what points they come from? A. Well, the shipments to Commerce, we will begin at Redman, Scott County. I may not be able to give the county in every one of those cases, but it was Redman, Scott County, Missouri, and Charter Oak, New Madrid County, I believe, Missouri; Clarkton, Dunklin County; Campbell, Dunklin County, Missouri; and Frisbee, Dunklin County, Missouri; Gibson, Dunklin County, Missouri, and Pascola is in either Dunklin or Pemiscot—Dunklin, I guess.

"Q. Were some of these shipments made from Bloomfield? A. Yes, sir; Valley Ridge, in Dunklin County, Missouri, and Ade, in Stoddard County, Missouri; Bloomfield, in Stoddard County, Missouri, I believe these are the points.

"Q. Are all these points, doctor, in the State of Missouri? A. They are; yes, sir.

"Q. Is Commerce in the State of Missouri? A. Yes, sir.

"Q. Did these shipments of ties ever leave the Frisco lines between the initial point of shipment and Commerce, Missouri? A. No, sir.

"Q. Did these shipments at any time during transit ever leave the State of Missouri? A. No, sir.

"Q. Have you some of the bills of lading and expense bills? A. Here are the bills of lading and expense bills for the cars that were shipped on the higher rate.

"Q. You mean after the rate was raised? A. After the rate was raised; yes, sir.

"By Mr. Bailey: Doctor, why are these ties shipped to Commerce, Missouri? A. They are shipped to Commerce for the purpose of getting an accumulation of ties in bulk so that they may be reshipped to various other points that we may have or get orders for.

"Q. Did B. Johnson & Co. maintain a yard at Commerce, Missouri? A. They do.

"Q. On whose property is that yard? A. Mr. Anderson—I don't remember his initials, but a Mr. Anderson, who is in the grain business there.

"Q. Did you lease this yard from Mr. Anderson for B. Johnson and Co.? A. I did verbally. I have no lease contract, but made arrangements.

"Mr. Woerner: You mean you have no written contract or have no contract? A. I have no written contract. It is merely verbal agreement that we use the ground and buildings as long as we want to.

"Mr. Bailey: Is this yard connected with any railroad or boat line? A. No, sir.

"Q. In whose possession is that yard? A. It is in our possession now. I mean B. Johnson & Son's possession at this time.

"Q. In whose name are all these shipments made? A. B. Johnson & Son.

"Q. And shipped to whom? A. To B. Johnson & Son.

"Q. And unloaded on this yard? A. Yes, sir.

"Q. At the time of the unloading, is any arrangement made with any common carrier for the further transportation of these ties? A. No; no prearrangements made; that is, no contract or arrangements made.

"Q. Do you unload these ties here for the purpose of avoiding any form of freight rate? A. No, sir.

"Q. Haven't you also a different kind of shipment from different points not included in these shipments to this yard? A. B. Johnson & Sons are shipping ties from Southeast Missouri to different points, St. Louis, Cairo, East St. Louis direct. That is, I mean they have a railroad inspector out with their employees inspecting these ties, in loading them on cars throughout Southeast Missouri where they come direct.

"Mr. Woerner: You mean sometimes you send them to Commerce, Missouri, and sometimes to these other points direct without going to Commerce? A.

What I wish to say is this: That the two businesses are going on right along; some of the ties go to Commerce and some ties go to final destination, which might be St. Louis, East St. Louis or Cairo, Illinois, or Thebes, Illinois.

"Mr. Bailey: Explain to the commission why it is necessary to have this double form of shipment. A. They buy all grades of ties and kinds of wood and ties cut out in Southeast Missouri; say, for an illustration, 100 maple and 100 oak, some red oak and some white oak are on a yard; these ties are grouped in groups so far as the railroad companies receiving them are concerned. Groups one, two, three or four, as the case might be, and they only load one group of those ties in a car and we have to hold the ties on each yard until a car of each kind of wood or material accumulates. Why? Because ties deteriorate in value and it requires a much greater amount of money to handle the business than it would if we were able to bunch these ties in one car and ship them to the yard and there separate them and reship them to points.

"Q. When you get a carload of ties at any one point that are ready for the market, what do you do with them? A. Ship them direct to their destination.

"Q. Irrespective of what the freight charges may be? A. Yes, sir; in this instance, it is as cheap or cheaper than it is to ship them by Commerce. We get the statutory rate.

"Q. Doctor, in loading ties at these little points you have mentioned, can you get a load of ties ordinarily that are ready for the market? A. Not in any reasonable time; no.

"Q. Do you load all kinds of ties into the same car? A. Yes, in this Commerce business we do.

"Q. And ship them where? A. To Commerce.

"Q. What is done there? A. Well, they are yarded and separated—the various kinds of wood separated and inspected and reshipped.

"Q. I will ask you if you know at the time these ties are loaded at the initial point where they will· go to from Commerce? A. Not any particular tie, I don't know.

"Q. What is necessary at Commerce to direct where they shall go? A. It is necessary to have first a certain amount of various kinds of ties and then the ties should be inspected.

"Q. Does this inspection at Commerce determine where these ties shall go? A. Yes, sir; largely.

"Q. You say you have no prearrangement made for shipping them away from there? A. No, sir.

"Q. Do you know when you ship them in there who will take them away? A. No, sir.

"Q. Do you know where they will take them, whether to St. Louis, Cairo or East St. Louis or where? A. Not any individual carload. We know that some of these ties will reach Cairo and some will reach East St. Louis, and some of them shipped to St. Louis proper.

"Q. I will ask you if some of these ties included in these bills of lading have been shipped to Missouri? A. Not in these bills of lading.

"Q. I will ask you if you have recently shipped some ties from the Commerce yard to St. Louis, Missouri? A. Yes, sir; B. Johnson has during this month.

"Q. I mean, of course, complainant all the time? A. Yes, sir.

"Q. I will ask you if those ties that were shipped from Commerce, Missouri, had previously been brought in from other points in Southeast Missouri to Commerce? A. Yes, sir.

"Q. I will ask you if the Frisco caused you to pay on those ties the advanced rate? A. Yes, sir.

"Q. Prior to reaching Commerce? A. Yes, sir.

"Q. You remarked a while ago that it was cheaper for you to ship direct where it was possible and pay the interstate rate than it was to unload at Commerce;

have you any special instance of that? A. Well, you can figure the cost of transporting these cars by way of Commerce from anywhere in Southeast Missouri, where the rate to Cairo, Illinois, or Thebes, would be eight or nine cents per hundred pounds—the through rate, I mean—it would pay us or any shipper to ship the ties through direct, rather than ship them by way of Commerce, even though they got advantage of the rate.

"Q. The expense of loading and unloading? A. The expense of loading and unloading and towing down the river amounts to more than the through rate would amount to. That is, on a nine-cent rate, up to a nine-cent rate; now, if it was a higher rate than that to Cairo, it would possibly be in favor of shipping to Commerce.

"Q. I will ask you what the average rate, in your estimate, of all these shipments is? A. Well, from point of memory, the rate to Frisbee is seven and a half cents per hundred pounds; that is the through rate, I mean; to one point it is eleven cents, to Cairo, Illinois.

"Q. You say where the through rate is nine cents that you just play even either way you ship? A. Yes, sir; just break even, and if it is under nine cents we would lose money; say, lose a cent.

"Mr. Woerner: By sending to Commerce? A. Yes, sir; and if it is over nine—that is, if it was ten cents—we would make a cent, I figure, on those shipments, not counting your extra expense of your employees at Commerce. You would just about break even on this movement.

"Mr. Bailey: Then the purpose of this unloading is not to avoid an interstate rate? A. No, sir.

"Q. I will ask you if when you load mixed ties, say at Clarkton, one of the stations you have mentioned, if they are marketable in that condition at all? A. No; say you load, as an illustration, some red oak, maple, ash; you couldn't sell them that way.

"Q. I will ask you if you have a number of ties on

the Commerce yard at present? A. Yes, sir; there are quite a few ties there now. I don't know just how many.

"Q. Do you know where they are going? A. No, sir; I don't.

"Q. Does anybody know where they are going? A. My understanding is some of them are not sold.

"Q. They are on the yard leased by B. Johnson & Son? A. Yes, sir.

"Q. How have they moved out and where have they moved to? A. Been two barges of them moved to Cairo, Illinois; been one car, to my knowledge, moved to St. Louis, Missouri.

"Q. When was that car moved to St. Louis? A. This last week.

"Q. Prior to that were any of these ties moved to St. Louis? A. No, sir.

"Q. All of the other ties have gone down the river by barge to Cairo? A. Except what are now on the yard.

"Q. Would you be willing to say whether you would consider Commerce as a sort of intermediate point in the shipment of these ties from initial point to point of final destination? A. I regard Commerce as the point where orders would be filled out; the yard from which orders would be filled after the ties were shipped. . . .

"Q. They had been working down there four or five years without any yard; what reason did you give Mr. Fornshell why he should put a yard in there in August, 1913? A. I gave him this reason, based on the present freight rate; that by establishing the yard down there it would enable us to clean up a territory and get the money out of ties that couldn't otherwise be shipped.

"Q. When you say based upon the present freight rate, you mean based upon the Missouri statutory rate? A. Yes, sir.

"Q. Now about the inspection of these ties; are they inspected in Commerce? A. They are inspected in Commerce and reconsigned. The ties that are shipped to Cairo are inspected finally by the railroad companies; the inspector at Cairo when they are loaded on the cars.

"Q. He doesn't inspect at Commerce? A. He doesn't inspect at Commerce. We inspect at Commerce when we load on the barge.

"By Mr. Bailey: You say you haven't had any yard there during four or five years prior to this? A. No, sir.

"Q. What is your reason for that? A. The reason is that the old freight rate would have made it impossible to have had a yard there. It would have been a prohibitory rate, and as I said a while ago, you can't utilize a yard unless you can get advantage of the present statutory rate anywhere. It takes that to break even.

"Q. I will ask you, just for illustration, if you have a few ties down at Clarkton, you just get a few of each kind of tie, is that it? A. Yes, sir, that is true at a great many places.

"Q. Can you load a carload of ties there ready for the market? A. Not for final destination, no, sir.

"Q. When you load these ties aren't they a mixture of all kinds of ties? A. Yes, sir.

"Q. Started to the Commerce yard? A. Yes, sir.

"Q. Do you consider at the time they start to the Commerce yard they have started on their final destination? A. No, I don't consider they have.

"Q. Or are they shipped there for the purpose of sorting them, dividing them and inspecting them so as to be loaded in condition for their final destination? A. Yes, sir; that is my conception of the business.

"Q. Are you using this yard for all your tie business of Southeast Missouri? A. No, sir.

"Q. Are you using it just for such a class of ties as you cannot handle by the interstate shipment? A. That is the object I had in mind, in using this yard at Commerce.

"Q. Bringing out that object a little further, following Mr. Wood's suggestion. The purpose of that yard, if I understand your explanation, was to clean up that territory? A. Yes, sir.

"Q. Explain to the commissioner just a little further; what you mean by cleaning up that territory? A. Well, I mean you have some ties at Bloomfield mixed that you can't load by taking the railroad inspection there—and load out—I mean you might have some ties in the same condition at Ade and points throughout Southeast Missouri and these small accumulations amount to quite a lot of ties and you can't load them; that is, if you bought them there, you have got to ship them somewhere or else not take that class of business.

"Mr. Woerner: You mean you have got to ship them somewhere where they accumulate and at each point you can assort them so as to make carload lots to be shipped out from that point? A. Yes, sir."

Said witness further testified that, in shipping the ties from the points in question to Commerce at the statutory rate of two cents per hundred pounds, the additional expense necessary to get the ties unloaded on the yard and loaded again and thence by boat to Cairo and the cost of unloading, amounted to about nine cents per one hundred pounds.

That on or about July 15, 1913, the complainants established their said tie-yard at Commerce, and that the complaint in this cause was filed September 10th of the same year.

Such additional evidence introduced, that may be necessary to consider to properly understand the legal propositions presented, will be considered in connection therewith.

I. The main legal proposition presented by this record is, do the facts of this case constitute the various shipments of ties, mentioned in the evidence, from the various stations on the St. Louis & San Francisco Railroad in this State to Commerce, Missouri, interstate or intrastate commerce? .

Interstate or Intrastate Commerce?

Counsel for appellants contend that they are interstate shipments, while counsel for the complainants and the commission insist they are intrastate shipments.

Counsel in support of the former contention cite us to numerous cases, and among others, are the following: Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U. S. 498; Ohio Railroad Comm. v. Worthington, 225 U. S. 101; Texas & New Orleans Ry. Co. v. Interstate Commerce Commission, 227 U. S. 111.

In my opinion, none of those cases are applicable to the case at bar. In each, the cargo was homogeneous, could have been shipped from the point of origin to the point of destination on a through bill of lading; and the uncontradicted evidence showed that the identical cargo in each case was intended to be shipped from the initial point to the point of destination, and that its stoppage in transit was for some collateral purpose, and not to break the continuity of the through shipment to some other state or country. But in the case at bar, the ties were not homogeneous, and could not therefore have been shipped on a through bill of lading from said various points in Missouri, to places in New York and other points beyond the limits of this State.

The evidence in this case shows that each car of ties shipped to Commerce was composed of a mixed lot of all grades and kinds of wood, some maple and oak, some red oak and some white oak; that when they reached Commerce they were unloaded from the cars and inspected and assorted into piles according to the

character of the timber and their grades; and that after that had been done, those which conformed to terms and conditions of the contracts of sale made by the complainants to the railroads mentioned, were accepted by them and then loaded on the barges and shipped to the points of their destination in other states. And the evidence also showed that all such ties not accepted by said railroads under said contracts were sold and delivered to other persons in this State, or were still on hand in the tie yards of complainants at Commerce, Missouri.

Counsel for appellants insist that this evidence does not differentiate this case from those cited in support of their position, and place their insistence upon the fact, as they contend, that practically all of the ties shipped to Commerce were from the beginning of the transportation intended to be shipped to other states; and that what few were sold in this State or were left on hand were so negligible that no court should permit that fact to determine the character of the shipments made to other states, and cite in support thereof the case of Ohio Railroad Commission v. Worthington, supra.

In a proper case, that rule is not only sound, but wise, in its operation; that is, where the evidence shows that the whole design of the shipper was to engage in interstate or foreign commerce, the mere fact that some inconsiderable part of the cargo should, for some reason, supposedly a good one, be unloaded and disposed of, with no intention of changing the destination of the remainder, should not change the character of the through shipment. But that is not the case at bar; no specific tie at the original point of shipment was intended to be shipped from this State to another, but only such as might, after reaching Commerce, be inspected and accepted by the purchaser—the New York Central or the Rock Island Railroad Company—which might have been one or all, or none of them. Nor can

we say as a matter of law that the number of ties sold in this State and those still in the yards at Commerce are negligible, when we consider that one carload was sold in this State and that from 2500 to 3000 ties still remain on hand in the yards at Commerce, especially when we consider the fact that the complainants were in business at Commerce for a period of only two months before this suit was instituted.

As well stated by counsel for the Commission:

"We think that these ties cut at various localities in the State and then shipped in mixed and unassorted carload lots to Commerce, Missouri, for necessary inspection, assortment, and such other shipment or disposition as the owner thereof might desire to make of them at Commerce, whether in Missouri or outside of Missouri, cannot be held to have been in transit from one State to another while enroute from such points of origin to the point of concentration at Commerce."

This position of counsel is clearly supported and decided by the Supreme Court of the United States in the case of Coe v. Errol, 116 U. S. 517. In that case the logs were cut in the State of New Hampshire and hauled down to the town of Errol and there deposited on the bank of and in the river, Androscoggin, to be transported from there upon the river to Lewistown, Maine. While the logs were in that position the town of Errol assessed them for taxes. The defense was that the logs were the subject of interstate commerce, and therefore not subject to taxation by the town of Errol. The Supreme Court of the United States in that case held that the logs at the time of the assessment had not become the subject of interstate commerce, and in so holding, said:

"The question for us to consider, therefore, is whether the products of a state (in this case timber cut in its forests) are liable to be taxed like other property within the state though intended for exportation to another state, and partially prepared for that pur-

pose by being deposited at a place of shipment, such products being owned by persons residing in another state. . . .

"Do the owner's state of mind in relation to the goods, that is, his intent to export them, and his partial preparation to do so, exempt them from taxation? This is the precise question for solution.

"This question does not present the predicament of goods in course of transportation through a state, though detained for a time within the state by low water or other causes of delay, as was the case of the logs cut in the State of Maine, the tax on which was abated by the Supreme Court of New Hampshire. Such goods are already in the course of commercial transportation, and are clearly under the protection of. the Constitution. And so, we think, would the goods in question be when actually started in the course of transportation to another state, or delivered to a carrier for such transportation. There must be a point of time when they cease to be governed exclusively by the domestic law and begin to be governed and protected by the national law of commercial regulation, and that. moment seems to us to be a legitimate one for this purpose, in which they commence their final movement for transportation from the state of their origin to that of their destination. When the products of the farm or the forest are collected and brought in from the surrounding country to a town or station serving as an entrepot for that particular region, whether on a river or a line of railroad, such products are not yet exports, nor are they in process of exportation, nor is exportation begun until they are committed to the common carrier for transportation out of the state to the state of their destination, or have started on their ultimate passage to that state. Until then it is reasonable to regard them as not only within the state of their origin, but as a part of the general mass of property of that state, subject to its jurisdiction, and

liable to taxation there, if not taxed by reason of their being intended for exportation, but taxed without any discrimination, in the usual way and manner in which such property is taxed in the state. . . .

"But no definite rule has been adopted with regard to the point of time at which the taxing power of the state ceases as to goods exported to a foreign country or to another state. What we have already said, however, in relation to the products of a state intended for exportation to. another state will indicate the view which seems to us the sound one on that subject, namely, that such goods do not cease to be a part of the general mass of property in the state, subject as such to its jurisdiction, and to taxation in the usual way, until they have been shipped or entered with a common carrier for transportation to another state, or have been started upon such transportation in a continuous route or journey. We think that this must be the true rule on the subject. It seems to us untenable to hold that a crop or herd is exempt from taxation merely because it is, by its owner, intended for exportation. If such were the rule, in many states there would be nothing but the lands and real estate to bear the taxes. Some of the western states produce very little except wheat and corn, most of which is intended for export; and so of cotton in the Southern states. Certainly, as long as these products are on the lands which produce them, they are part of the general property of the state, and so we think they continue to be until they have entered upon their final journey for. leaving the state and going to another state. It is true it was said in the case of 'The Daniel Ball,' 10 Wall. 557, 565: 'Whenever a commodity has begun to move as an article of trade from one state to another, commerce in that commodity between the states has commenced.' But this movement does not begin until the articles have been shipped or started for transportation from the one state to the other. The carrying of them in carts or other vehicles,

or even floating them to the depot where the journey is to commence, is no part of that journey. That is all preliminary work, performed for the purpose of putting the property in a state of preparation and readiness for transportation. Until actually launched on its way to another state, or committed to a common carrier for transportation to such state, its destination is not fixed and certain. It may be sold or otherwise disposed of within the state, and never put in course of transportation out of the state. Carrying it from the farm or the forest to the depot is only an interior movement of the property, entirely within the state, for the purpose, it is true, but only for the purpose, of putting it into a course of exportation. It is no part of the exportation itself. Until shipped or started on its final journey out of the state its exportation is a matter altogether '*in fieri*,' and not at all a fixed and certain thing.''

It seems to me that the Coe-Errol case is on all-fours with the case at bar, and is controlling herein.

The same question was presented in the case of the Chicago, Milwaukee & St. Paul Ry. Co. v. Iowa, 233 U. S. 334, which cites and confirms the case of Coe v. Errol, supra; and in so doing the court used this language:

''The railway company contended, both before the commission and in the state court, that the shipments in question were interstate; and it was alleged in its answer that the method of transportation resorted to was a device of shippers to secure, by adding the rate from the initial point in Illinois to Davenport to the rate established by the Iowa distance tariff from Davenport to other points in the State, a lower rate than that applicable to an interstate shipment from the point in Illinois to the point of final destination.

''The railroad commission held that the transportation desired from Davenport was a purely intrastate service, saying: 'Under the admitted facts, the city of

Davenport became a distributing point for coal shipped by the consignor. The certainty in regard to the shipments of coal ended at Davenport. The point where the same was to be shipped beyond Davenport, if at all, was determined after the arrival of the coal at Davenport. The coal was under the control of the consignee and he could sell it in transit or at Dâvenport or consign it to a point on respondent's railway, or any other railway, at his own discretion.' Upon the trial of the present suit in the State court, the State introduced in evidence the proceedings, decision and order of the commission, and without further evidence both parties rested. The Supreme Court of the State took the same view of the facts that the commission had taken and accordingly held that the shipments were intrastate. The court said that the facts showed that the coal was originally consigned to the coal company in Davenport, that it was there held until sales were made, that the consignee had taken delivery, paying the freight to the initial carrier and assuming full control. [152 Iowa, 317, 319.]

"The record discloses no ground for assailing this finding. It is undoubtedly true that the question whether commerce is interstate or intrastate must be determined by the essential character of the commerce and not by mere billing or forms of contract. [Ohio Railroad Commission v. Worthington, 225 U. S. 101; Texas & N. O. R. R. Co. v. Sabine Tram Co., 227 U. S. 111; Railroad Commission of Louisiana v. Texas & Pacific Ry. Co., 229 U. S. 336.] But the fact that commodities received on interstate shipments are reshipped by the consignees, in the cars in which they are received, to other points of destination, does not necessarily establish a continuity of movement or prevent the reshipment to a point within the same State from having an independent and intrastate character. [Gulf, Colorado & Santa Fe Ry. Co. v. Texas, 204 U. S. 403; Ohio Railroad Commission v. Worthington,. 225 U. S. 101, 109;

Texas & N. O. R. R. Co. v. Sabine Tram Co., 227 U. S.
111, 129, 130.] The question is with respect to the nat-
ture of the actual movement in the particular case, and
we are unable to say upon this record that the State
court has improperly characterized the traffic in ques-
tion here.''

Under the ruling of the last case, Commerce ''be-
came a distributing point for local shipments by the
consignor. The certainty in regard to the shipments
of coal ended at Davenport.'' So did the certainty of
the shipment of the ties in this case end at Commerce.
''The point where the same was to be shipped beyond
Davenport, if at all, was determined after the arrival
of the coal at Davenport. The coal was under the con-
trol of the consignee and he could sell it in transit or
at Davenport or reconsign it to a point on respondent's
railway or any other railway, at his own discretion.''
So in the case at bar, the points where the ties were
to be shipped beyond Commerce, if at all, were to be
determined by the complainants. They were under
their control and not that of the carrier and they could
sell them in transit or at Commerce, or consign them
to other points on the appellant's railway or any other
railway, at their discretion.

These views are in keeping with the following lan-
guage taken from the case of Coe v. Errol, 116 U. S.
517, supra:

''Until actually launched on its way to another
state, or committed to a common carrier for transporta-
tion to such state, its destination is not fixed and cer-
tain. It may be sold or otherwise disposed of within
the state, and never put in course of transportation
out of the state. Carrying it from the farm, or the for-
est, to the depot, is only an interior movement of the
property, entirely within the state, for the purpose, it is
true, but only for the purpose, of putting it into a
course of exportation; it is no part of the exportation it-

268 Mo.—11

self. Until shipped or started on its final journey out of the state its exportation is a matter altogether *in fieri,* and not at all a fixed and certain thing."

If the shipments mentioned in the case at bar are to be controlled by the rulings of the Supreme Court of the United States in the cases reviewed, then it seems to me that they had not started on their certain and final journey to other states prior to the time they arrived at Commerce, and were inspected and accepted by the purchasers thereof.

We are, therefore, of the opinion that all of said shipments from the various points in this State to Commerce were intrastate, and not interstate shipments.

II. It has been suggested that B. Johnson & Son established the tie yards at Commerce and adopted the method of shipment before mentioned for the purpose of availing themselves of the intrastate rates of transportation, and to avoid the interstate rates which are much higher than the former.

**Accumulation Point: To Evade Interstate Rates.**

This suggestion is not supported by the evidence; but upon the contrary, it shows that the expense of unloading, separating, grading and reloading the ties at Commerce is practically equal to the difference between the two rates.

Moreover, the evidence clearly shows that the method mentioned was adopted because the tie timber in that section of the State had been largely exhausted, which fact made it difficult to procure ties in carload lots of the same kind and grade without great delay, and attended with great expense. But by the mode adopted they loaded the cars with all kinds and grades of ties, and shipped them to Commerce, assorted, graded and inspected them. By that method they cleaned up the tie business at each shipping point quickly as they went, and thereby avoided much delay and expense conducting their business.

In that way B. Johnson & Son procured more ties in a shorter time and at less expense than they otherwise could have done; and that is why that method of doing business was adopted.`

It must follow, therefore, from what has been said that the rates of transportation prescribed in section 3241, Revised Statutes 1909, etc., are applicable to all of said shipments made to Commerce.

I therefore dissent from the majority, opinion. *Graves* and *Walker, JJ.*, concur herein.